**LANO EQUIPMENT, INC., Respondent,**

v.

**CLARK EQUIPMENT COMPANY, INC., et al., Appellants.**

No. C4–86–1410.

Court of Appeals of Minnesota.

Feb. 3, 1987.

Robert Sheran, J. Michael Dady, James P. McCarthy, Joseph A. Thomson, Lindquist & Vennum, Minneapolis, for respondent.

Eugene M. Warlich, Edward F. Fox, Tonia T. Kittelson, Doherty, Rumble & Butler, Minneapolis, for appellants.

Heard, considered and decided by NIERENGARTEN, P.J., and FOLEY and CRIPPEN, JJ.

## OPINION

NIERENGARTEN, Judge.

Clark Equipment Company appeals from the trial court's temporary injunction order, contending that the court abused its discretion.

## FACTS

Appellant Clark Equipment, Inc., is a Delaware corporation whose business unit, Melroe Company, (collectively "Melroe") manufactures Bobcat "skid-steer" loaders and distributes them to 606 dealerships in the U.S. and Canada. Melroe presently commands 54% of the skid-steer loader market in Minnesota.

Respondent Lano Equipment, Inc., (Lano) is a dealer of agricultural and construction equipment located in Shakopee, Minnesota. Partly through a predecessor entity owned by the same family, Lano has been a Bobcat dealer since 1960, when approached by Melroe with its new product. Over the 26 years as a Bobcat dealership, Lano has made the Bobcat its most important line, as well as its only front-end loader. From the beginning, Lano has sold Bobcats throughout the seven-county metropolitan area.

For many years, Melroe has required its dealerships to sign yearly Dealer Sales Agreements. These agreements are effective for one calendar year, and contain an integration clause. Under these agreements, each dealer is assigned an Area of Primary Responsibility (APR), historically a geographical area in which the dealer was to carry out his primary responsibility, which was "to *promote the sale* of products and parts." (Emphasis added). In other words, the APR appears to have been a promotion, rather than sales territory. Prior to 1986, these APRs were loosely defined. Lano's APR was "the trade area of the city of Shakopee." The APR of Lano's main competitor since 1983, Tri-State Bobcat of Bloomington, was "the trade area of the city of Minneapolis-St. Paul" in 1984 and 1985; in 1983, it also included "surrounding counties." Prior to 1986, neither dealership's sales territory was restricted.

The 1986 agreements that Melroe proposed to all of its dealers restricted the sales territories of the dealerships for the first time, by coupling specifically-defined APRs with a mandatory 10% "profit pass-over fee" for all sales made in another dealer's APR. All dealerships except Lano agreed to these de facto sales territory restrictions.

In Lano's case, the first 1986 agreement proposal reduced its APR from the "trade area of the city of Shakopee" to a smaller, specifically-defined area which excluded the Twin City metropolitan area in which Lano was accustomed to selling, and which was now assigned to Tri-State Bobcat alone. When Lano refused to sign, Melroe gave much of that proposed area to Tri-State Bobcat as well—Burnsville, Apple Valley, Rosemount, and part of Farmington—and allowed Tri-State Bobcat to relocate to Burnsville, about six miles from Shakopee. Melroe then made a second proposal to Lano, of the smaller, even more agricultural area that remained and Lano again refused to sign. During the negotiation period that extended into 1986, the parties operated without a dealer agreement.

On March 21, 1986, Melroe sent Lano a letter giving ninety days' notice of termination of the dealership, and expressing the hope that they could agree on a 1986 dealer agreement in the meantime. During that ninety-day period Melroe stated that it would accept orders from Lano under the terms of the expired 1985 agreement, but

would not accept orders which exceeded Lano's prior purchasing pattern for the period.

In response, Lano sent its own proposed 1986 agreement containing what it felt to be a more equitable division of territories. However, Melroe replied that it was unacceptable because the proposed APR included sales territory already assigned to Tri-State Bobcat.

On June 3, 1986, before the expiration of the ninety-day termination notice period, Lano filed suit against Melroe (Clark Equipment Company) and Robert Manke (manager of the region that included Tri-State Bobcat), alleging breach of contract, unjust enrichment, tortious interference with contract and prospective contractual advantage, breach of implied covenant of good faith, state antitrust violations, and unlawful price discrimination. In addition to damages, Lano asked for a temporary and permanent injunction restraining Melroe from terminating the dealership without cause, from enforcing the terms of the 1986 agreement mandating the 10% pass-over fee, from restricting or inhibiting Lano's ability to make sales in its customary territory, and from restricting the quantity of Bobcats available to Lano.

The trial court ordered Melroe temporarily enjoined from "interfering with, altering or seeking to terminate Lano Equipment, Inc., as a dealer * * *."

## ISSUE

Did the trial court err in issuing the temporary injunction restraining Melroe from terminating or interfering with the Lano dealership?

## ANALYSIS

### I

First, we note that Melroe has appended to its Reply Brief certain tax returns and financial statements of Lano's which were not in evidence before the trial court. It is well-settled that this court's scope of review does not encompass evidence not presented to the trial court. *Holtberg v.*

*Bommersbach,* 235 Minn. 553, 554, 51 N.W.2d 586, 587 (1952); *Ronay v. Ronay,* 369 N.W.2d 6, 10 (Minn.Ct.App.1985). That documentary evidence has been stricken.

> [I]n granting or refusing interlocutory injunctions the court shall * * * set forth the findings of fact and conclusions of law which constitute the grounds of its action. * * * Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses.

Minn.R.Civ.P. 52.01.

The temporary injunction was issued on the basis of pleadings, affidavits, and depositions. This court may disregard findings of fact by trial courts when the findings are based on documentary evidence. *See In re Trust Known as Great Northern Iron Ore Properties,* 308 Minn. 221, 225–26, 243 N.W.2d 302, 305–06 (1976), *cert. denied sub nom., Arms v. Watson,* 429 U.S. 1001, 97 S.Ct. 530, 50 L.Ed.2d 612 (1976). However, in reviewing the trial court's findings and the character of the documentary evidence presented in this case, we defer to the trial court's findings and conclude that the district court's findings are not erroneous. *See In re Election of Ryan,* 303 N.W.2d 462, 465 (Minn.1981) ("although the findings of the trial court may not be set aside unless clearly erroneous, Minn.R.Civ.P. 52.01, we are not bound by the trial court's interpretation of documentary evidence *if we believe an error has been made."* (emphasis added)).

### II

The trial court's ruling on a motion for temporary injunction is "largely an exercise of judicial discretion." *Thompson v. Barnes,* 294 Minn. 528, 533, 200 N.W.2d 921, 925 (1972). The sole issue on appeal is "whether there was a clear abuse of such discretion by the trial court disregarding either the facts or the applicable principles of equity." *Id.* (footnotes omitted). On appeal, this court will view the facts alleged in the pleadings and the affidavits as

favorably as possible to the party who prevailed below. *Saliterman v. Finney*, 361 N.W.2d 175, 177 (Minn.Ct.App.1985).

There are five factors to be considered in determining whether the trial court's decision should be sustained:

(1) The nature and background of the relationship between the parties preexisting the dispute giving rise to the request for relief.

(2) The harm to be suffered by plaintiff if the temporary restraint is denied as compared to that inflicted on defendant if the injunction issues pending trial.

(3) The likelihood that one party or the other will prevail on the merits when the fact situation is viewed in light of established precedents fixing the limits of equitable relief.

(4) The aspects of the fact situation, if any, which permit or require consideration of public policy expressed in the statutes, State and Federal.

(5) The administrative burdens involved in judicial supervision and enforcement of the temporary decree.

*Dahlberg Brothers, Inc. v. Ford Motor Co.*, 272 Minn. 264, 274–75, 137 N.W.2d 314, 321–22 (1965) (footnotes omitted).

(1) Lano is attempting to preserve the status quo between itself and Melroe until trial on the merits of its claims. The trial court found that Lano has been a Bobcat dealer since 1960; that Melroe represented to Lano that, if it made the substantial commitment of time, effort and capital required to develop a market for the Bobcat, it would not be terminated except for a failure to perform capably, and then only after notice and opportunity to correct any deficiencies. The trial court further found that Melroe has continued to represent to prospective dealers that they can expect to continue as a Bobcat dealer so long as they are doing the job and are not in serious financial trouble; that this has indeed been Melroe's custom and practice; and that, based on these representations and practices, Lano has invested 26 years and a half million dollars in developing a Bobcat market in the seven-county metro area.

The trial court also found that, as required of a Bobcat dealer, Lano maintains a suitable building, trained employees, truck and trailer for demonstrations, and advertising. It also provides service facilities and personnel for fulfilling warranty obligations, servicing used equipment, and maintaining an adequate parts inventory. The court also found that, during the fiscal year ending February 28, 1986, over 75% of Lano's new and used equipment sales involved Bobcats (over three million dollars' worth); that Bobcats command a 54% share of the skid-steer loader market in Minnesota, and in the metropolitan area; and that, based on a belief in the Bobcat and on Melroe's representations, Lano carries no competing brand of skid-steer loader.

Finally, the trial court found that, after initially operating without any written agreement, Melroe subsequently requested that their dealers sign yearly Dealer Sales Agreements; that the 1985 agreement expired on December 31, 1985; that since then the dealer relationship between Lano and Melroe has continued without any written sales agreement; that even when written agreements were in effect, the parties did business in part based on oral representations as well as custom and practice; and that until 1986 Melroe had never attempted to restrict Lano's sales territory.

Based upon our review of the evidence which is viewed in the light most favorable to Lano, the trial court's findings are supported by the record. We are satisfied that, without a temporary injunction, the status quo would be injured or destroyed before a trial on the merits could be heard.

■ (2) The trial court concluded that the balance of harms favored Lano; that if the injunction did not issue, Lano would suffer irreparable injury.

[A] temporary injunction usually should be granted where the questions presented are grave and injury to the moving party will be certain, substantial, and irreparable if it is denied and the final determination is in his favor, while if it is granted and the decision is unfavorable

the inconvenience and loss to the opposing party will be inconsiderable or may be adequately protected by a bond * * *. 43 C.J.S. *Injunctions* § 17 (cited with approval in *Dahlberg*, 272 Minn. at 275 n. 12, 137 N.W.2d at 321, n. 12).

Melroe contends that the balance of harms favors lifting the temporary injunction because if it is allowed to stand, its entire dealership network will be threatened. We see no risk to the network. All of the other 605 dealerships have signed their agreements, and have apparently been operating under them without complaint for a year. Since both parties at oral argument agreed to seek an expedited trial on the merits,[1] a final determination on the merits should not take too long. In the meantime, any damage suffered by Melroe appears to be reasonably covered by the bond that Lano deposited with the trial court.

Melroe also contends that equitable relief should not be granted because Lano has an adequate remedy at law in money damages for any harm it suffers.[2]

We find that the *Dahlberg* case is controlling. The *Dahlberg* court found equitable relief appropriate because if Ford Motor Company were not justified in terminating Dahlberg Motors' dealership contract but were permitted to do so anyway, the dealership would sustain serious injuries by virtue of being left with a physical plant with no Ford products to sell, facing a loss of trained employees, having its liaison with the public interrupted, etc. *Dahlberg*, 272 Minn. at 277, 137 N.W.2d at 322.

The key here, as in *Dahlberg*, is the difficulty of determining damages for such injuries. In considering the adequacy of legal remedies in a specific performance context, a leading treatise has stated that one of the most important factors to be considered is "difficulty and uncertainty in determining the amount of damages to be awarded * * *." 5A Corbin on Contracts § 1142 (1964).

Injury caused by the destruction of the good will of a business or by the prevention of business profits is seldom measurable with reasonable certainty, this fact leading, in innumerable cases, to the enforcement of provisions for liquidated damages and to specific enforcement of the contract by an injunction or affirmative decree. * * *

* * * [I]t is not necessary that [the] uncertainty in amount should be so great as to prevent the awarding of all damages whatsoever. * * * Even though the degree of uncertainty is not so great as to prevent the award of substantial damages by a jury, it may nevertheless be so great as to convince the court that it is far better to prevent the injury than to attempt to make compensation after it has occurred.

*Id.* (footnotes omitted).

We find no abuse of discretion in the trial court's conclusion that the balance of harms favors Lano. Lano's potential loss of customers, profits and good will is sufficiently uncertain that we find it better to prevent the injury by temporary injunction than to attempt to determine appropriate compensation after the loss has occurred. As in *Dahlberg*, if the distributor does eventually prevail, "the situation is one where a dealer found to be satisfactory for [26] years is given such additional period of life as may be needed to reach a decision on the merits." 272 Minn. at 276, 137 N.W.2d at 322.

(3) The trial court concluded that Lano had demonstrated a reasonable likelihood of succeeding in its claims that Melroe breached its contract by restricting its sales territory, and by threatening to terminate the dealership relationship unless

---

**1.** We strongly urge the trial court to give this case a priority setting on the trial calendar.

**2.** Melroe cites *O.M. Droney Beverage Co. v. Miller Brewing Co.*, 365 F.Supp. 1067 (D.Minn. 1973). Although *Droney* may support Melroe's position, we note that it is not consistent with the rulings of the Minnesota Supreme Court in *Dahlberg*, and cases following. We also note that, in the thirteen years since *Droney* was decided, it has never been cited by a Minnesota state court.

Lano accepted the restrictions.[3] Noting Melroe's objection that the integrated 1985 Dealer Agreement had expired by its own terms on December 31, 1985, the trial court held that Melroe was equitably estopped from denying the existence of a long term manufacturer/dealer contract still in existence between the parties.

The trial court based its estoppel theory on *Northern Petrochemical Co. v. United States Fire Insurance Co.*, 277 N.W.2d 408 (Minn.1979), which states:

> To establish a claim of estoppel, plaintiff must prove that defendant made representations or inducements, upon which plaintiff reasonably relied, and that plaintiff will be harmed if the claim of estoppel is not allowed.

*Id.* at 410. Applying this rule, the trial court noted in its memorandum that Melroe, through its agents, did so represent and induce and Lano did so reasonably rely; that this relationship continued for nearly 26 years during which time Lano developed an impressive market in the Twin Cities; and that in 1986 Melroe, for the first time, attempted to impose strict territorial boundaries upon Lano's dealership.

The trial court found that the written contract had little to do with the relationship of the parties. Although it described Lano's territory as Shakopee, Lano had hundreds of customers throughout the metropolitan area.

Melroe argues that the parol evidence rule bars admission of evidence of its oral representations and course of dealing over the last 26 years. Alternatively, Melroe argues that there can be no reasonable reliance on oral representations that contradict express contract terms, and therefore estoppel does not lie.

■ It may be that these contentions, which go to the merits, will ultimately prevail. However, it must be remembered that the granting of a temporary injunction does not involve a determination on the

merits. *State v. Northern Pacific Railway Co.*, 221 Minn. 400, 411, 22 N.W.2d 569, 575 (1946). "[I]t has often been held proper to maintain the status quo by a temporary injunction even though complainant's right to permanent relief is doubtful." 43 C.J.S. *Injunctions* § 19b(2)(a) (cited with approval in *Dahlberg*, 272 Minn. at 275 n. 13, 137 N.W.2d at 321 n. 13).

> [W]e must recognize that the facts on which the trial court acts in granting a temporary injunction are, by the nature of the situation, provisional and that the injunctive authority exercised will continue only until a more scientific analysis of the problem is made possible by trial on the merits.

*Dahlberg*, 272 Minn. at 274, 137 N.W.2d at 321 (citation omitted).

On the basis of the limited documentary evidence that was before the trial court, we cannot say that the parol evidence rule is dispositive of the issues here. As Professor Wigmore stated in the introduction to his 274 page treatment of this rule:

> 'Few things,' wrote Professor Thayer, are darker than this, or fuller of subtle difficulties'; and this condition of the law all members of the profession will concede. * * * [T]he so-called parol evidence rule is attended with confusion and obscurity which make it the most discouraging subject in the whole field of evidence.

9 Wigmore, Evidence § 2400 (Chadbourn rev. 1981).

The resolution of this issue, as well as the related issue of "reasonable reliance," is properly reserved for a hearing on the merits, at which both parties will have an opportunity to fully present their arguments. We are satisfied that the trial court acted within the proper exercise of its discretion in concluding that Lano has demonstrated a sufficient probability of success on the merits to warrant preservation of the status quo until a full hearing can be had.

---

**3.** Because we agree with the trial court as to these claims, we need not consider the likelihood of success on the merits of the antitrust claims.

(4)(5) We further agree with the trial court that the public interest will not be harmed by a temporary injunction in this case. Also, we note that the court has expressed a willingness to handle any administrative problems that may arise from the granting of this temporary injunction.

### DECISION

The trial court's order granting a temporary injunction pending a trial on the merits is affirmed.

Affirmed.